# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM THOMAS COATS, <br><br> Plaintiff, <br><br> v. <br><br> MUHAMMAD CHAUDHRI, et al., <br><br> Defendants. | Case No. 1:13-cv-02032-AWI-BAM (PC) <br><br> FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED <br><br> (ECF No. 31) <br><br> **Fourteen (14) Day Deadline** |

**Findings and Recommendations**

**I.   Introduction**

Plaintiff William Thomas Coats ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds against Defendants Dr. Muhammad Chaudhri and John Doe emergency medical staff for deliberate indifference to serious medical needs in violation of the Eighth Amendment.[1] (ECF No. 10.)

Currently before the Court is Defendant Chaudhri's motion for summary judgment, filed on November 10, 2016, pursuant to Federal Rule of Civil Procedure 56.[2] (ECF No. 31.) Plaintiff

---

[1] Plaintiff has not provided the Court with written notice identifying the John Doe defendants with sufficient information to locate them for service of process. By separate order, Plaintiff will be directed to show cause why the doe defendants should not be dismissed from this action.

[2] Concurrent with the motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment. (ECF No. 31-6.) See Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v. Rowland, 154

1

opposed the motion on January 3, 2017. (ECF Nos. 36, 37, 38.) Defendant Chaudhri replied on January 10, 2017, and Plaintiff filed a supplemental response on February 15, 2017. (ECF Nos. 42, 43, 44.) Defendant Chaudhri 's motion is deemed submitted. Local Rule 230(l).

Having considered the moving, opposition and reply papers, the Court recommends that Defendant Chaudhri's motion for summary judgment be granted.

## II. Plaintiff's Supplemental Response

As noted above, Defendant Chaudhri filed a motion for summary judgment, Plaintiff responded and Defendant replied. Thereafter, on February 15, 2017, Plaintiff filed a supplemental response to Defendant's reply. (ECF Nos. 43, 44.) However, this Court's Local Rules provide only for a motion, an opposition, and a reply. Local Rule 230(1). Neither the Local Rules nor the Federal Rules of Civil Procedure provide the right to file a response to a reply. See, e.g., Wyatt v. Zanchi, No. 1:09-cv-01242 BAM PC, 2011 WL 5838438, at *5 (E.D. Cal. Nov. 21, 2011). In this case, the Court neither requested a response to Defendant Chaudhri's reply nor granted a request on Plaintiff's behalf to file such a response. Accordingly, the Court will recommend that Plaintiff's response to Defendant Chaudhri's supplemental response (ECF Nos. 43, 44) be stricken from the record and not considered for purposes of summary judgment.

## III. Allegations in Complaint

In the operative complaint, Plaintiff alleges that Dr. Sao, a primary care provider, told Plaintiff that he could not receive treatment for hepatitis-C without a liver biopsy. Although other doctors had told Plaintiff that he did not need a liver biopsy, Plaintiff agreed so that he could get treatment to repair his liver. Dr. Sao scheduled Plaintiff for a liver biopsy at the ACH prison hospital.

On May 9, 2013, Plaintiff was ushered into the pre/post-op area of the prison hospital after 1:00 p.m. He was placed in a hospital gown, handcuffed to a gurney and hooked up to an IV bag. Plaintiff was informed that he would be struck with the liver biopsy needle a single time. Plaintiff alleges that he was punctured by Dr. Chaudhri with the biopsy needle three separate times within a 90 second to 2 minute period. Dr. Chaudhri was viewing the procedure through a sonogram

F.3d 952, 957 (9th Cir. 1988); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

machine.

When Dr. Chaudhri first withdrew the livery biopsy needle, he exclaimed "Oh shoot." Dr. Chaudhri raised the needle to show Plaintiff that there was a small piece of liver tissue hanging out of the first inch of the long bore liver needle and no sample in the clear tube. Dr. Chaudhri told Plaintiff that he did not extract enough for a viable sample. Without asking if Plaintiff would like to proceed, Dr. Chaudhri grabbed a back-up liver needle and ripped open the packaging. He forced the second needle into Plaintiff's liver, which caused Plaintiff to feel pain in his testicles all the way to his right collarbone area. Plaintiff screamed loudly and asked if this was normal. Dr. Chaudhri then withdrew the second needle and made some inaudible sounds. Dr. Chaudhri then exclaimed, "I have done thousands of these and this has never happened!!!" Dr. Chaudhri panicked and started yelling orders at the two nurses present to give him another needle out of the cabinet. A nurse tossed a third needle to Dr. Chaudhri, who ripped open the sterile packaging. Dr. Chaudhri then buried the third needle into Plaintiff's liver. The pain was unbearable and Plaintiff screamed and begged Dr. Chaudhri to stop. When Dr. Chaudhri extracted the third needle, it was completely filled with liver sample. Dr. Chaudhri then put pressure on Plaintiff's side and repeatedly wiped it. Plaintiff asked if he was still bleeding because he was beginning to feel nauseated, lightheaded and dizzy. Dr. Chaudhri pointed to the monitor and stated that all bleeding had stopped.

Plaintiff was wheeled to the post-area where his vitals were taken. Although his blood pressure was spiking, the nurse told Plaintiff it was normal. Plaintiff was then dressed and escorted back to B-Facility Yard. Plaintiff and another inmate were taken to the work change area to strip for security reasons. While Plaintiff was disrobed, the other inmate pointed to Plaintiff's pressure bandage and said, "Look." When Plaintiff looked down, his bandage was soaked in blood. The blood also was seeping out of the edge of the bandage and running down Plaintiff's outer thigh. Plaintiff alerted the tower officer, who told Plaintiff to report to the B-Facility Medical Clinic. Plaintiff staggered to the clinic. A nurse took Plaintiff's vitals and Plaintiff was wheeled back to the hospital emergency room. At the hospital, Plaintiff was placed in a large observation room, but emergency staff ignored his cries of pain. Plaintiff was returned to his

prison cell around 9:00 p.m. after being told that there was nothing wrong with him.

Although various night counts were done, none of the officers questioned why Plaintiff was on the floor of his cell in his underwear. The following morning, Plaintiff tried to sit up and then threw up. Plaintiff alerted his cellie and told him to call "man down." Plaintiff was dragged out of the cell and taken by ambulance to the Catholic Charities Hospital in Bakersfield. Plaintiff was taken to the operating room for emergency surgery to repair his liver. Plaintiff spent two days in intensive care and ten days total in the hospital.

### IV. Defendant's Motion for Summary Judgment

At issue is Plaintiff's claim that Defendant Chaudhri "botched" the liver biopsy and was deliberately indifferent to Plaintiff's pain and suffering both during and after the procedure, which resulted in Plaintiff's later hospitalization and emergency surgery. By this motion, Defendant Chaudhri argues he is entitled to summary judgment because the undisputed facts do not support a section 1983 claim for deliberate indifference in violation of the Eighth Amendment. Alternatively, Defendant Chaudhri asserts that he is entitled to qualified immunity because there was no constitutional violation.

#### A. Undisputed Material Facts (UMF)[3]

1. Plaintiff William Thomas Coats has had the Hepatitis C virus since 1999. (ECF No. 31-2, Ex. A, Deposition of William Thomas Coats ("Coats Depo.") at p. 30:3-19.)

2. In 2009, he began taking a two drug regimen—Interferon and Ribavirin—for 12 weeks at High Desert State Prison until he stopped altogether. (Id. at pp. 39:23-41:10.)

3. It was the policy of the California Department of Corrections and Rehabilitation ("CDCR") in 2013 to require all prison health care providers to order liver biopsies prior to

---

[3] These undisputed facts are derived from Defendant's Statement of Undisputed Facts and Plaintiff's opposition to Defendants' Statement of Undisputed Facts. (ECF Nos. 31-2 and 38.) In his opposition, Plaintiff indicates that he disputes the "highlighted" facts, but stipulates to the "unhighlighted" sections. (ECF No. 38 at pp. 1-2.) Plaintiff's purported highlights, which cannot be viewed on the Court's docket, do not comply with Local Rule 260. Local Rule 260(b) expressly requires that any party opposing a motion for summary judgment "reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial." The Court therefore has not considered any reference to "highlighted" text. Instead, the Court considered only those portions of Plaintiff's opposition identifying the basis for an asserted dispute of material fact, Unless otherwise indicated, disputed and immaterial facts are omitted from this statement and relevant objections are overruled.

4

starting Interferon and ribavirin medication regiment to treat Hepatitis C if the patient had Genotype 1 Hepatitis C, because patients with Genotype 1 had only a 50% or less chance of being cured. (ECF No. 31-5, Declaration of Dr. Jeff Sao ("Sao Decl.") at ¶ 3 and Ex. B at pp. 1, 5.)

4. The liver biopsy is diagnostic procedure where a portion of the liver is extracted and tested to determine how far the liver disease has progressed (i.e., the disease stage). (Sao Decl. at ¶ 4.)

5. If a patient with Hepatitis C stops taking the Interferon and Ribavirin drug treatment before the regimen is complete, he may develop a resistance to the drugs which would render restarting the drug treatment ineffective. For this reason, the drug regimen is not given to inmate patients who have less than 16 months remaining in prison, because they may not be able to continue treatment outside of prison. (Id. at ¶ 4 and Ex. B at pp. 1, 6, 12.)

6. Interferon and Ribavirin drug treatment is not recommended for patients who have liver disease that is only Stage 1 because it is too early to treat. (Id. at ¶ 5 and Ex. B at pp. 3, 5, 6.)

7. In 2013, CDCR required that anyone with Genotype 1 Hepatitis C must have a liver biopsy before starting treatment because Genotype 1 had only a 50% or less chance of being cured. (Id. at ¶ 6 and Ex. B at p. 1.)

8. Plaintiff has Genotype 1a and 2b Hepatitis C. (Exhibit A to Sao Decl. at p. 1; Coats Depo. at p. 30:13-18.)

9. In May 2013, Dr. Jeff Sao was one of Plaintiff's primary care doctors at Corcoran State Prison ("CSP"). (Sao Decl. at ¶ 2.)

10. Dr. Sao ordered a liver biopsy for Plaintiff as a precondition to restarting Plaintiff on the Interferon/Ribavirin drug regimen because Plaintiff had Genotype 1 Hepatitis C (which required a liver biopsy), and because Dr. Sao was aware that Plaintiff had previously started on and stopped taking the drug regimen at a prior prison. (Id. at ¶ 7 and Ex. A at p. 2.)

11. Plaintiff consented to the biopsy in order to restart treatment. (Coats Depo. at pp. 51:19-52:3.)

12. Dr. Muhammad Chaudhri has been working as a contract radiologist for the CDCR

for over 5 years. (ECF No. 31-3; Declaration of Muhammad Chaudhri ("Chaudhri Decl.") at ¶ 3.)

13. Dr. Chaudhri has conducted over 1,000 radiological services, including x-rays, biopsies, endoscopies and colonoscopies, on site at CSP. (Id.)

14. On May 9, 2013, Dr. Chaudhri was contracted with CDCR to perform several liver biopsies at CSP. (Id.)

15. At approximately 1:30 p.m. on May 9, 2013, Plaintiff was brought to the hospital at CSO and sat in the waiting room just outside the operating room. (Ex. A to Chaudhri Decl. at pp. 1-2, 8.)

16. Plaintiff was given a "stack of forms" to read and sign, including a consent form, which he read, "every one of them" and signed the consent form. (Coats Depo. at pp. 60:11-23; 68:2-10.)

17. Plaintiff understood the biopsy procedure and while he expressed some concern about something going wrong, he did not protest the procedure, and even chatted with Dr. Chaudhri about how much Dr. Chaudhri was getting paid per biopsy. (Chaudhri Decl. at ¶¶ 4-5; Coats Depo. at pp. 58:6-9; 59:12-19.)

18. Before the procedure, Dr. Chaudhri explained to Plaintiff exactly what he was going to do, including how he was going to locate his liver and when he was going to insert the biopsy needle. (Chaudhri Decl. ¶ 4; Coats Depo. at pp. 61:19-22.)

Plaintiff attempts to raise a genuine dispute of material fact by asserting that he was told that he would only be stuck one time, not three times. (ECF No. 38 at p. 2.) Plaintiff's assertion does not raise a genuine dispute regarding Dr. Chaudhri's explanation of the procedure.

19. Plaintiff asked questions and summed up his understanding. (Ex. A to Chaudhri Decl. at p. 3.)

Plaintiff again attempts to raise a genuine dispute of material fact by asserting that he was told that he would only be stuck one time, not three times. (ECF No. 38 at p. 2.) Plaintiff's assertion does not raise a genuine dispute regarding his questions or his understanding of Dr. Chaudhri's explanation of the procedure.

20. From what Dr. Chaudhri observed, the procedure went well with no extraordinary

complications. (Id. at p. 8.)

21. Dr. Chaudhri first injected 20 ml of Lidocaine 10% to locally numb the area where the biopsy needle would be inserted. (Id. at pp. 4, 8.)

Plaintiff attempts to raise a genuine dispute of material fact by asserting that he was told that he would only be stuck one time, not three times. (ECF No. 38 at p. 2.) Plaintiff's assertion does not raise a genuine dispute regarding the injection of Lidocaine.

22. Dr. Chaudhri then used an ultrasound monitor to guide and insert the biopsy needle into Plaintiff's liver to obtain a tissue sample. (Id. at ¶ 6 and Ex. A at p. 4.)

23. According to Plaintiff, he was stuck three different times, and screamed out in pain after the second time but he did not tell Dr. Chaudhri to stop. (Coats Depo at pp. 70:23-71:7.)

24. When Plaintiff thought he was bleeding, Dr. Chaudhri pointed to the sonogram monitor to show him he was not bleeding, but Plaintiff didn't know what Dr. Chaudhri was talking about. (Id. at p. 79:16-25.)

25. At 2:45 p.m. Dr. Chaudhri noted in his physician progress notes, alert and oriented, afebrile, vital signs stable, no acute distress, status post ultra sound guided liver biopsy, "did well." (Chaudhri Decl. at ¶ 5 and Ex. A at p. 6.)

26. Plaintiff was then wheeled into the waiting area to recover, and where he could be monitored. (Chaudhri Decl. at ¶ 5.)

27. Plaintiff was given a meat sandwich and water, which he ate and drank and appeared to have "good appetite" "tolerating [by mouth] food and liquids well." (Ex. A to Chaudhri Decl. at p. 5; Coats Depo. at pp. 73:6-15, 74:2-25.)

28. At 2:50 pm RN Fairchild, accompanied by RN A. Gundran took Plaintiff's vital signs, and again at 2:55 pm. (Ex. A to Chaudhri Decl. at pp. 5, 7; Coats Depo. at p. 72:4-14.)

29. The nursing notes prepared at 2:50 pm stated that Plaintiff denied pain, that he was able to move, breathe normally, had normal neurology and circulation. (Ex. A to Chaudhri Decl. at p. 7.)

Plaintiff attempts to raise a genuine dispute of material fact by arguing that he "didn't deny pain" and that he tried to tell RN Fairchild, but she "just down played my pain issue saying I

had just been though alot [sic]." (ECF No. 38 at p. 2.) However, Plaintiff's assertion does not alter the substance of the treatment notes, nor does it dispute that he was able to move, breathe normally, and had normal neurology and circulation.

30. Plaintiff's abdomen was soft and flat and his bowels were audible, which meant that there were no signs of internal bleeding. (Id.; ECF No. 31-4, Declaration of Dr. Huu Nguyen ("H. Nguyen Decl.") at ¶ 4.)

31. Plaintiff explained at deposition that he did not complain about any pain beyond saying that he was not feeling well, he was dizzy and nauseous to a nurse, because he thought it was normal and because he wanted to "man up." (Coats Depo. at pp. 76:7-10, 83:4-9.)

32. Plaintiff never complained directly to Dr. Chaudhri, even as he saw Dr. Chaudhri leaving after his final biopsy. (Coats Depo. at pp. 77:5-78:13, 81:19-82:4.)

33. By 3:00 pm Plaintiff was discharged from the hospital to the yard. (Ex. A to Chaudhri Decl. at pp. 5, 8.)

34. Plaintiff walked unassisted out of the waiting room to the security check point of the hospital (about 350 yards), and then walked through the yard to his housing building (another 100 yards). (Coats Depo. at p. 84:10-87:3.)

35. At 3:30 pm Plaintiff returned to ACH and was admitted to the ER with complaints of pain to the biopsy site and dizziness. (Ex. A to Sao Decl. at pp. 3-4.)

36. Nurse Gladden examined his dressing and noted "no active bleeding," that the Plaintiff had "good color," and she put new pressure dressing on him. (Id. at p. 4.)

37. Plaintiff was seen by Dr. Huu Nguyen, who was the ER doctor at ACH the evening of May 9, 2013. (H. Nguyen Decl. at ¶ 3 and Ex. A at p. 1.)

38. After examining Plaintiff, Dr. Nguyen noted his vital signs were within normal limits, his lungs were clear, and his abdomen was "soft" and not-tensile, which suggested no internal bleeding. (Id.)

39. Dr. Nguyen wrote in his notes: "no bleeding noted at liver biopsy site no hematoma noted." (Id.)

40. Plaintiff was prescribed Tylenol 3 for three days and was given his first dose by

mouth at 6:25 pm. (Id. at p. 1-2.)

41. At 7:33 pm, Dr. Nguyen discharged Plaintiff from the ACH hospital with an instruction to follow up with his primary care doctor per policy, and to return to the ER if his abdominal pain increased, if there was abdominal distension, or if he became dizzy. (Id. at pp. 1-2.)

42. The next day, at 9:46 am, Plaintiff reported "my stomach hurts" and was taken back to the prison hospital again and was seen by Dr. William Convalecer. (Ex. A to Sao Decl. at pp. 5, 7.)

43. Unlike the night before, Plaintiff now appeared pale and "jaundice," his abdomen "rebounded" on exam, and he was hypotensive (had low blood pressure). (Id. at pp. 5-6.)

44. Dr. Convalecer spoke to the operating room nurse from the biopsy procedure, who indicated that Plaintiff "apparently tolerated the procedure very well without any complications" and that she had seen "no signs or symptoms of bleeding" yesterday. (Id. at p. 6.)

Plaintiff attempts to raise a genuine dispute of material fact by asserting that he did not tolerate the procedure well. (ECF No. 38 at p. 2.) However, Plaintiff is not a physician or other medical provider and cannot provide opinion testimony as to whether or not he tolerated the procedure well. Fed. R. Evid. 701, 702.

45. Dr. Convalecer ordered Plaintiff to be sent and admitted to Mercy Hospital "Code 2" for what he thought was retroperitoneal bleeding following the liver biopsy. (Id. at pp. 6-7.)

46. When he arrived at Mercy Hospital, Plaintiff had emergency embolization to stop the bleeding in his right liver artery, as well as a blood transfusion. (Id. at pp. 8-13.)

47. Dr. Zora Gill, a surgeon at Mercy Hospital visited Plaintiff after the embolization procedure later that day and noted "there is no evidence of active bleeding" that "the patient's pain is improving," that "most likely hematoma will be resolved without any problems" and "at this point there is absolutely no indication for surgical intervention." (Id. at p. 9.)

Plaintiff disagrees with Dr. Gill's observation that the hematoma would be resolved without any problems and argues that he has had a lot of pain and suffering since that time. (ECF No. 38 at p. 2.) Plaintiff's argument does not raise a genuine dispute of fact regarding Dr. Gill's

opinion immediately following the embolization procedure. Further, Plaintiff is not a medical expert and cannot opine as to the cause of any "pain and suffering" since that time. Fed. R. Evid. 701, 702.

48. Plaintiff's lab results from the liver biopsy came back stating that he had stage 1 chronic hepatitis C, and because of this, the CDCR was not placing him on any drug treatment. (Coats Depo at p. 33:11-24.)

49. Plaintiff has no medical training. (Coats Depo. at p. 25:4-10.)

50. Dr. Chaudhri was not Plaintiff's primary care doctor, and had no role, responsibilities or rights to provide care to Plaintiff outside of performing the liver biopsy. Unless the CDCR granted permission, Dr. Chaudhri could not even enter the prison grounds let alone have contact with Plaintiff. (Chaudhri Decl. at ¶ 7.)

51. Dr. Chaudhri's overall direct involvement in Plaintiff's medical care lasted approximately 15 minutes – the amount of time it took to prepare and conduct the liver biopsy. (Id. at ¶¶ 4, 7.)

**B. Legal Standard**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. See Soremekun v. Thrifty

Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Id. (citing Celotex, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id.

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. Id. at 929; see also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." Soremekun, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." Anderson, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. See Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**C.   Discussion**

   **1.   Defendant's Position**

By the instant motion, Defendant Chaudhri contends that the undisputed facts do not support a section 1983 claim for deliberate indifference. First, Defendant Chaudhri argues that routine pain is expected during a liver biopsy, and any pain from the procedure was caused by the failure to obtain a sufficient sample on the first try, requiring two additional attempts. Second, Defendant Chaudhri concedes that even if he "botched" the biopsy, this suggests, at most, negligence or malpractice, not deliberate indifference. (ECF No. 34 at p. 5.) Finally, as to events following the biopsy, Defendant Chaudhri asserts that he cannot be held liable for deliberate indifference because there is no evidence that he knew Plaintiff later experienced complications and required hospitalization. (Id. at p. 6.)

   **2.   Plaintiff's Position**

In opposition, Plaintiff asserts that Defendant Chaudhri caused wanton infliction of pain with the second and third liver stick, which should never have happened with a sonogram-guided liver biopsy. Plaintiff contends that the pain was not routine, as evidenced by his "horrendous screams," which did not occur with the first liver stab of the large bore liver biopsy needle. (ECF No. 37 at pp. 7, 9.) Plaintiff claims that he was never told that Defendant Chaudhri was going to stab his liver repeatedly until he got a viable sample. (Id. at p. 9.) Plaintiff also claims that he could not ask Defendant Chaudhri to stop even if he wanted to because Plaintiff had been told that without the biopsy, he would not be restarted on the two-drug regimen for treatment of his hepatitis C. (Id. at p. 9.) Plaintiff alleges that his screaming should have sufficiently put Defendant Chaudhri on notice of the wanton infliction of pain. (Id.)

Plaintiff further alleges that he suffered serious harm when Defendant Chaudhri withdrew the third large bore liver biopsy needle and blood was flowing from the hole. Before Defendant Chaudhri applied a pressure bandage to the wound, he had to continually wipe Plaintiff's side with gauze until Plaintiff asked if he was bleeding. (Id. at p. 10.) Defendant Chaudhri told Plaintiff that he was not bleeding. (Id.) Plaintiff argues that from these facts alone Defendant Chaudhri should have been able to draw the inference that something was seriously wrong inside

of Plaintiff and that he should follow up with it, but he instead decided to quickly bandage Plaintiff and move to the next patient. (Id. at p. 10.)

Plaintiff also alleges that in the hour after the procedure, he was told to drink the carton of milk and eat the sandwich, but he only ate half of the sandwich because he was nauseous, dizzy, in pain and bleeding. (Id. at p. 11.) Plaintiff claims that he voiced all of these concerns to Nurse Fairchild, who he assumes relayed these concerns to Defendant Chaudhri. Nurse Fairchild told Plaintiff that it was all normal and that he would feel better the following day. (Id.) Plaintiff additionally alleges that his highly elevated blood pressure readings after the procedure were ignored. (Id. at pp. 14-15.)

Plaintiff reasserts that Defendant Chaudhri was deliberately indifferent to his serious medical need and inflicted wanton and unnecessary pain, both during the biopsy procedure and for the 18-20 hours he caused Plaintiff to writhe around his cell floor. Plaintiff contends that all of the doctor reports from Mercy Hospital have stated that cause of the internal bleeding was a direct result of the liver biopsy. (Id. at p. 18.)

### 3. Analysis

A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment in violation of the Eighth Amendment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The two part test for deliberate indifference requires the plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,' " and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096. A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Deliberate indifference is a high legal standard," Simmons v. Navajo Cty. Ariz., 609 F.3d 1011, 1019 (9th Cir. 2010); Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible

medical need" and the indifference caused harm, Jett, 439 F.3d at 1096.

Deliberate indifference may be manifested in the manner "in which prison physicians provide medical care." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc); see also Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996) (deliberate indifference may be inferred based upon a medical professional's erroneous treatment when the decision is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible did not base the decision on such judgment).

In applying the deliberate indifference standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at 105 06. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. Cty. of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

In this case, Plaintiff's assertion that Defendant Chaudhri "botched" the biopsy procedure is not sufficient to support a claim of deliberate indifference. Even if Defendant Chaudhri did botch the biopsy procedure, such action amounts to negligence or malpractice, neither of which support a claim for deliberate indifference in violation of the Eighth Amendment. See Broughton, 622 F.2d at 460; Wood, 900 F.2d at 1334; see also Estelle, 429 U.S. at 106. Additionally, Plaintiff has not presented any affirmative evidence from a medical expert to suggest that Defendant Chaudhri's actions during the procedure were such a substantial departure from accepted professional judgment, practice or standards.

Plaintiff also suggests that Defendant Chaudhri departed from standard medical practices by not informing Plaintiff before the procedure that he might need to attempt more than once to

get an adequate liver sample. (ECF 37 at pp. 4:10-5:11). However, even if that were the case, Plaintiff has at most a claim for negligence, not deliberate indifference. See Cardona v. Syverson, No. 2:11–cv–1680 TLN KJN P, 2013 WL 3941019, at *11 (E.D. Cal. July 30, 2013) (plaintiff's claim that defendant failed to secure plaintiff's fully informed consent and failed to explain the risks before performing the biopsy is no more than a negligence claim).

Plaintiff additionally argues that during the procedure Defendant Chaudhri should have known that he was in pain because of his screaming. However, there is no indication that Defendant Chaudhri "was aware that Plaintiff was experiencing unnecessary pain, or pain beyond what was normally expected during an invasive biopsy procedure." (ECF No. 42 at p. 2; ECF No. 31-3, Chaudhri Decl. at ¶ 5.) Further, it is undisputed that Plaintiff never told Defendant Chaudhri to stop the procedure, and that Defendant Chaudhri noted in his progress notes that Plaintiff was in no acute distress and did well during the procedure. UMF 23, 25; ECF No. 37 at p. 5. Additionally, the operating room nurse, R.N. Gundran, also wrote in her surgical notes that Plaintiff "[t]olerated the procedure well", and conveyed this to Plaintiff's treating doctor the next day when Plaintiff returned to the hospital. (ECF No. 31-3, Ex. A to Chaudhri Decl. at p. 4; (ECF No. 31-5, Exhibit A to Sao Decl. at p. 6.)   The notes of the recovery room nurse, R.N. Fairchild, prepared during her observation of Plaintiff after the surgery, stated that Plaintiff "[t]olerated procedure well. Vitals stable, awake, alert, oriented." (ECF No. 31-3, Ex. A to Chaudhri Decl. at p. 5.)

As a final matter, Plaintiff contends that Defendant Chaudhri was deliberately indifferent following the procedure, including during the 18-20 hours when Plaintiff was in his cell. However, according to the undisputed evidence, Plaintiff's vitals were stable following the procedure, he was able to eat at least a portion of a meat sandwich and drink milk, he denied pain after the procedure, and he was able to walk unassisted to his housing unit after being discharged. UMF 25, 27, 29, 31, 34. Plaintiff also never complained directly to Defendant Chaudhri, even when he saw him leaving after the final biopsy. UMF 32. There is no indication that Defendant Chaudhri had any further contact with Plaintiff after leaving the hospital. UMF 50, 51. Moreover, the evidence shows that when Plaintiff returned to the hospital several hours later, he

15

had no active signs of bleeding (as observed by the emergency room staff), which suggests that Defendant Chaudhri could not have known that Plaintiff was bleeding while under his care. UMF 36, 38, 39.

### V. Conclusion and Recommendations

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendant's motion for summary judgment, filed on November 10, 2016, be GRANTED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **September 11, 2017**　　　　/s/ *Barbara A. McAuliffe*
　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE